UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| KRISTY RENEE ROBINSON, )<br>)<br>Plaintiff )<br>)<br>vs. )<br>)<br>SOCIAL SECURITYADMINISTRATION, )<br>COMMISSIONER, )<br>)<br>Defendant ) | Case No.   4:20-cv-01603-HNJ |

## MEMORANDUM OPINION

Plaintiff Kristy Robinson seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding her claim for a period of disability and disability insurance benefits.  The undersigned carefully considered the record, and for the reasons expressed herein, **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.  The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment. (Doc. 14).

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11ᵗʰ Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at § 404.1520(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the listed impairments. *Id.* at § 404.1520(d). If a claimant's impairment meets the applicable criteria at this step, that claimant's impairment would prevent any person from performing substantial gainful

activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525.  That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment.  *See Williams v. Astrue,* 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.") (citing 20 C.F.R. §§ 404.1520, 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work.  20 C.F.R. § 404.1520(e).  At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work.  *See id.* § 404.1520(a)(4)(iv).  If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled.  *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work.  20 C.F.R. §§ 404.1512(b)(3), 404.1520(g).  If the claimant can perform other work, the evaluator will not find the claimant disabled.  *See id.* § 404.1520(a)(4)(v); *see also* 20

C.F.R. § 404.1520(g).   If the claimant cannot perform other work, the evaluator will find the claimant disabled.   20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards.   *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).   The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'"   *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).   Indeed, "an ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence.'"   *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) (citing 42 U.S.C. § 405(g).   Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ.   "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. . . .   Substantial evidence . . . . is 'more than a mere scintilla,' . . . [and] means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"   *Biestek*, 139 S. Ct. at 1154 (citations omitted). Therefore, substantial evidence exists even if the

evidence preponderates against the Commissioner's decision.   *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Ms. Robinson, age 39 at the time of the ALJ hearing, protectively filed an application for supplemental security income benefits on February 20, 2018, alleging disability as of April 24, 2017.   (Tr. 297, 425-26).   The Commissioner denied Robinson's claims, and Robinson timely filed a request for an administrative hearing. (Tr. 348-54, 357-58).   The Administrative Law Judge ("ALJ") held a hearing on September 17, 2019 (Tr. 297-334), and issued a decision on October 23, 2019, finding Robinson not disabled.   (Tr. 13-27).

Applying the five-step sequential process, the ALJ found at step one that Robinson did not engage in substantial gainful activity after April 24, 2017, the alleged onset date.   (Tr. 18).   At step two, the ALJ found Robinson manifested the severe impairments of back degenerative disc disease, reconstructive surgery on joint, and chronic pain.   (*Id.*).   At step three, the ALJ found that Robinson's impairments, or combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.   (Tr. 20).

Next, the ALJ found that Robinson exhibited the residual functional capacity ("RFC")

to perform light work as defined in 20 CFR 404.1567(b) except frequent climbing of ramps or stairs; no climbing of ladders ropes or scaffolds; frequent balancing and stooping; occasional kneeling, crouching and crawling; occasional overhead reaching bilaterally; she must avoid concentrated exposure to extreme heat and vibrations; and she must avoid all hazards such as open flames, unprotected heights and dangerous moving machinery.

(*Id.*).

At step four, the ALJ determined Robinson could perform her past relevant work as a retail manager and retail area store manager.   (Tr. 26).   Thus, the ALJ determined that Robinson did not suffer a disability, as defined by the Social Security Act, since April 24, 2017.   (Tr. 27).

Robinson timely requested review of the ALJ's decision.   (Tr. 418-21).   On September 14, 2020, the Appeals Council denied review, which deems the ALJ's decision as the Commissioner's final decision.   (Tr. 1-4).   On October 13, 2020, Robinson filed her complaint with the court seeking review of the ALJ's decision. (Doc. 1).

## ANALYSIS

In this appeal, Robinson argues the ALJ improperly assessed her ability to perform past work, and the Appeals Council wrongly denied review after receiving new evidence supporting her disability.   For the reasons discussed below, the undersigned concludes those contentions do not warrant reversal.

## I.   Substantial Evidence Supports the ALJ's Finding that Robinson Can Perform Past Work

Robinson argues substantial evidence does not support the ALJ's finding that she can perform her past work as a retail manager and retail area store manager, as those jobs are generally performed.   Robinson argues the ALJ erred because he "did not consider all of the duties of [Robinson's] past work and evaluate [her] ability to perform those duties in spite of the impairments."   (Doc. 15, at 26).

The ALJ must determine whether a claimant can perform her past work, "either as the claimant actually performed it or as generally performed in the national economy." 20 C.F.R. § 404.1560(b)(2).   That determination must include a specific "finding of fact as to the physical and mental demands of the past job/occupation." SSR 82-62, 1982 WL 31386, at *4; *see also Nelms v. Bowen*, 803 F.2d 1164, 1165 (11th Cir. 1986) ("In the absence of evidence of the physical requirements and demands of appellant's work the ALJ could not properly determine that she retained the residual functional capacity to perform it.").   To gather the pertinent information, the ALJ may rely upon the claimant's testimony, the testimony of other people familiar with the claimant's work, the testimony of a vocational expert, and/or the Department of Labor's Dictionary of Occupational Titles (DOT).   20 C.F.R. § 404.1560(b)(2).

The ALJ followed those requirements in this case.   During the administrative hearing, Robinson testified that in her job as an Assistant Store Manager, she opened

7

and closed the store, processed credit card applications, and managed stock.   She lifted up to 70 pounds.   In her position as an Area Manager at Belk, she traveled between stores, set up displays, remodeled stores, set up store moves, and helped open new stores.   That job required lifting up to 100 pounds.   (Tr. 305-08).

In addition, in the Work History Report, Robinson described her duties as an Area Manager at Belk to include "sales, manage [people], set up stores, display hire-fire, open close stores, paperwork, graphs, charts, projections, etc., [and] team building." (Tr. 485).   She used machines, tools, and equipment; employed technical knowledge or skills; and wrote reports.   She frequently walked, stood, sat, climbed, stooped, knelt, crouched, crawled, handled, grabbed, grasped big objects, reached, wrote, typed, and handled small objects.   She frequently lifted up to 50 pounds of equipment, merchandise, tables, décor, and displays, and she sometimes lifted 100 pounds or more. She supervised more than 50 employees.   (*Id.*).

The Work History Report also states that in Robinson's position as a store manager at Eddie Bauer, she performed duties including "displays, merchandise, training, hire, fire, disciplinary actions, open stores, floor moves, sales, customer building, [and] team building."   (Tr. 486).   The other functional requirements of that position mirrored the Belk position, except she supervised more than 15 people.   (*Id.*).

The ALJ consulted a vocational expert to classify Robinson's past relevant work pursuant to DOT guidelines.   The vocational expert classified Robinson's past work as

a retail manager at the light level, but she opined Robinson performed it at the heavy level.   The vocational expert also classified Robinson's past work as a retail store area supervisor as light, but she opined Robinson performed it at the very heavy level.   (Tr. 330).   The ALJ provided the vocational expert an opportunity to ask additional questions about Robinson's past work, but the vocational expert did not ask any questions.   (Tr. 314).   Robinson's briefs fail to identify any particular requirement of her past relevant work that the ALJ overlooked, and she has not challenged the qualifications or testimony of the vocational expert.

Because the ALJ relied upon Robinson's hearing testimony and work reports, the vocational expert's testimony, and the DOT classifications, the court finds that he obtained sufficient information to appropriately classify Robinson's past relevant work. *See Williams v. Comm'r, Soc. Sec. Admin.*, 805 F. App'x 692, 695 (11th Cir. 2020) (citing 20 C.F.R. § 404.1560(b)(2)) ("In evaluating the demands of a claimant's past work, an ALJ may rely on the job descriptions set forth in the Dictionary of Occupational Titles (DOT) to determine the level of the work (from sedentary to very heavy) it required, as well as the claimant's own account of the work."); *Holder v. Soc. Sec. Admin.*, 771 F. App'x 896, 900 (11th Cir. 2019) (The ALJ appropriately relied on the claimant's testimony, his work history report, vocational expert testimony, and DOT descriptions to "paint a full picture of [the claimant's] past relevant work."); *Robinson v. Comm'r of Soc. Sec.*, 379 F. App'x 948, 953 (11th Cir. 2010) ("[A]n ALJ may properly consider information in the

DOT and a VE's testimony in determining whether a claimant can still perform her past relevant work."); *Savor v. Shalala*, 868 F. Supp. 1363, 1365 (M.D. Fla. 1994) ("[I]t is clear that the ALJ did determine the physical demands of the Plaintiff's past work and her ability to perform that work in light of her impairment.   The ALJ accomplished this by eliciting the opinion of a vocational expert.").

To the extent Robinson challenges the ALJ's finding that she possessed the residual functional capacity to perform a limited range of light work, she offers no substantive argument or evidence to support that challenge.   Thus, she has not satisfied her "burden of proving that [s]he is unable to perform [her] previous work." *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986) (citing *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983)).

Moreover, substantial evidence supports the ALJ's finding.   Robinson underwent cervical fusion surgery on June 19, 2017, to treat neck pain from an injury she received lifting a patient while working as a nurse.   (Tr. 601).   During a July 18, 2017, post-operative examination, Robinson experienced "some mild issues," but her condition was improving.   (Tr. 801).   She demonstrated full motor strength in her upper extremities and slow but stable gait.   In addition to her recovery from neck surgery, she complained of lower back pain.   Dr. Todd Smith, Robinson's orthopedic surgeon, recommended physical therapy for Robinson's cervical spine and released her

to work at light duty with no bending or twisting at the waist, no work above shoulder level, no working at unguarded heights, and no climbing of ladders or poles.   (*Id.*).

On August 2, 2017, Robinson presented to the Emergency Department at Marshall Medical Center-South with complaints of severe, abrupt-onset neck pain and back pain radiating into her right hip, thigh, knee, calf, and foot.   A cervical spine x-ray revealed no evidence of fracture or misalignment, surgical changes from the cervical fusion, intact cervical intervertebral disc spaces, and unremarkable regional soft tissues. A lumbar spine x-ray revealed no evidence of acute fracture, misalignment, or destructive osseous pathology; preserved lumbar intervertebral disc spaces; and unremarkable regional soft tissues.   The emergency department physician assessed Robinson with acute neck pain associated with cervical strain and acute right-sided lumbar radiculopathy, instructed her not to work until after August 4, 2017, prescribed pain medication, and instructed her to follow-up with her health care provider.   (Tr. 844-49).

On August 9, 2017, Robinson reported to Dr. Smith that her neck and back pain had increased, and she felt numbness and tingling in her neck.   She stopped participating in physical therapy due to pain, and her work asked her to complete tasks that violated medical restrictions.   Nonetheless, during the examination, she displayed full strength in the upper extremities.   The nurse practitioner ordered a CT myelogram of the cervical spine.   She agreed Robinson could "hold physical therapy for right

now," but Robinson could return to work at light duty with no bending or twisting at the waist, no work above shoulder level, no climbing ladders or poles, and no working at unguarded heights.   (Tr. 802).

On August 10, 2017, a CT scan of Robinson's cervical spine revealed a solid fusion of C5, C6, and C7, with partial disc herniation at C5-C6, reduced central canal space, mild central cord compression, and patent neural foramina.   Otherwise, the results stood unremarkable.   (Tr. 803).

On August 25, 2017, Robinson received an epidural steroid injection at the C6 vertebra on the left.   (Tr. 782).

On September 8, 2017, Dr. Smith noted Robinson experienced increasing symptoms in the left side of her face and left arm.   The physical examination revealed decreased sensation to light touch in the left forehead, face, neck, supraclavicular and infraclavicular region, deltoid, and arm.   She could rise normally from a seated position, and she displayed normal gait and station.   She experienced neck pain with extension, but she displayed full motor strength in the upper extremities.   Dr. Smith reviewed the CT scan, which revealed

> very good decompression at the C6-7 level.   No residual central or foraminal stenosis.   C5-6 has a small amount of focal residual central compression secondary to osteophyte at C5-6 but it is significantly better than the preoperative MRI.   There is fluid around the spinal cord with significant improvement overall at the C5-6 level.   It is very stable. There is no left foraminal stenosis.   There is a mild degree of right

foraminal narrowing.   The interbodies look to be in good position.
Hardware is in good position.

(Tr. 807).

Dr. Smith did not know how to relate Robinson's facial symptoms to her cervical

spine, as Robinson experienced "significant overall improvement in regard to the

cervical spine after the decompression at the C5-6 and C6-7 levels.   No residual

foraminal stenosis to the left at C5-6 or C6-7."   (*Id.*).   Rather, Dr. Smith opined

revascularization of the cervical cord could cause the facial symptoms, though he could

not rule out an intracranial problem.   He recommended a brain MRI and restricted

Robinson to sedentary work activity with significant restrictions, including no

prolonged standing or walking, no bending or twisting at the waist, no climbing ladders

or poles, no squatting or kneeling, and no operating mobile equipment.   (Tr. 807-08).

On October 4, 2017, Robinson reported no improvement and continued

paresthesias in the left upper extremity.   The clinical examination revealed decreased

sensation in the left shoulder area, full muscle strength in the upper extremities, and

slow gait and station. Dr. Smith cleared Robinson for sedentary work with no pushing

or pulling over 10 pounds, no repetitive bending at the waist, no bending or twisting at

the waist, no climbing ladders or poles, no reaching above shoulder level, no operating

mobile equipment, no work around hazardous machinery, no squatting, and no

kneeling.   (Tr. 810-11).

13

On October 23, 2017, a cervical spine MRI revealed normal alignment and craniocervical junction; no cord signal abnormality; no spinal canal narrowing or neural foraminal narrowing at C2-C3; uncovertebral degenerative change, posterior disc osteophyte, and no spinal canal or neural foraminal narrowing at C3-C4; posterior disc osteophyte and some mild to moderate right neural foraminal narrowing at C4-C5; posterior disc osteophyte, artifact seen from prior post-surgical change, effacement and flattening of the canal and cord, and some canal narrowing to 7mm at C5-C6; and no spinal canal narrowing or neural foraminal narrowing at C6-C7 and C7-T1.   (Tr. 780).

On November 1, 2017, Robinson complained to Dr. Smith of continued left neck pain, left facial pain, occasional pain down her left side, swelling in the left hand, and low back pain.   Dr. Smith reviewed the October 23, 2017, MRI, which he characterized as revealing some residual canal narrowing at the C5-6 and C6-7 levels, though fluid remained present around the spinal cord.   Consequently, Dr. Smith advised Robinson he was

> not sure doing any surgery for revision decompression would make her any better.   The reason for this is the fact there is fluid available for the cord and if the cord was going to expand more it still has the opportunity to do it at this point and doing a bony decompression would not make it any more likely it would expand.

(Tr. 814).   He referred Robinson for a second opinion, and he retained her work restrictions to sedentary activity.   (Tr. 815).

During an October 18, 2017, visit to Lakeshore Family Practice, the clinical examination revealed normal range of motion with no pain in Robinson's neck.   (Tr. 742-43).

On November 8, 2017, Robinson received a second opinion from Dr. Andrew Cordover at Andrews Sports Medicine and Orthopaedic Center.   Dr. Cordover reviewed Robinson's chart and past imaging results.   During the examination, Robinson displayed full strength in all upper extremities, except she displayed 4/5 strength in the left tricep.   Dr. Cordover assessed Robinson as experiencing status post cervical 6-7 fusion with myeloradiculopathy, excellent to complete resolution of her right upper extremity symptoms, continued left upper extremity symptoms, and possible cord dysfunction.   He advised Robinson may continue to experience residual symptoms due to the magnitude of her spinal cord injury, even though she underwent a satisfactory surgical decompression.   He recommended an electromyogram/nerve conduction study of Robinson's left upper extremity, and he prescribed vitamin B1. (Tr. 776-77).

On December 5, 2017, Dr. Ellerbusch performed an electromyogram, which revealed "chronic appearing left cervical radiculopathy with most active changes noted in the typical C6 (likely C7 involvement) with evidence of reinnervation in the C6 innervated muscles with subtle spontaneous denervation, all of which is consistent with the patient's prior surgery in June of 2017."   (Tr. 775).   As those findings reflected

15

Robinson's surgical history, they did not indicate "a progressive radiculopathic process," and "at least some additional neurological recovery can be expected." (*Id.*).

On December 13, 2017, Robinson continued to complain to Dr. Smith of left upper extremity symptoms, low back pain, and groin pain. She displayed full muscle strength in the upper and lower extremities, but she exhibited pain with range of motion in the right hip that radiated into her groin. She underwent a nerve conduction study, which indicated "some potential for additional neurological recovery, not an indication of any progressive radiculopathic process." (Tr. 816). Dr. Smith concluded he could do nothing further for Robinson's cervical spine, so he placed her at maximum medical improvement regarding that condition.

Regarding her lumbar spine, she had "known L5-S1 central, right paracentral disc herniation that is causing significant lateral recess and foraminal stenosis." (*Id.*). She also experienced some right lower extremity radiculitis. A right hip x-ray revealed moderate to moderate-severe right hip osteoarthritis, and Dr. Smith recommended a L5-S1 transforaminal block. He released Robinson to light work with no bending or twisting at the waist. (Tr. 816-17).

On December 22, 2017, Robinson received an epidural steroid injection on her right lumbar spine at L5 and S1. (Tr. 880).

On January 9, 2018, Robinson continued to complain to Dr. Smith of back and right leg pain despite undergoing an L5-S1 transforaminal block. She also complained

of continued neck pain, left upper extremity pain, and swelling, clicking, and popping in her neck.   Dr. Smith did not see a medical cause for swelling in Robinson's neck. Dr. Smith recommended lumbar spine surgery, but he opined Robinson should undergo a psychological evaluation before the surgery.   (Tr. 818-19).

On January 29, 2018, Robinson underwent a psychological evaluation at The Doleys Clinic.   (Tr. 858).   The assessor experienced difficulty evaluating the effect of Robinson's affective status on her physical condition due to her guardedness and defensiveness during the examination.   Robinson did not meet the diagnostic criteria for a conversion disorder, but psychological testing could not rule out some conversion symptoms.   "[T]here does appear to be a significant psychological aspect to her pain complaints and her symptoms are considered to reflect both physical and emotional dimensions."   The assessor believed antidepressant medication and cognitive behavioral therapy could assist with Robinson's mental and physical condition.

> Regarding further surgery, this is a difficult question to fully answer.   Her pathology strongly suggest[s] the need for intervention, however her affective status will likely impact her outcomes and there may be higher pain complaints and more functional limitations because of this.   Her prognosis may be improved with effective treatment of her affective and adjustment issues and this is recommended either prior to or concurrently with surgical intervention.   Ultimately, however, surgical intervention to address structural problems needs to be considered based upon the pathology that is present and if the severity is enough to warrant surgery. The possibility of guarded outcomes in pain and functioning related to psychological status in this situation may need to be accepted as a possibility and addressed as effectively as possible. Hopefully with

concurrent treatment to address both her physical and psychological needs her outcomes will be maximized.

(Tr. 863).

On February 21, 2018, Robinson underwent a lumbar spine MRI, which revealed normal findings at T12-L1 and L1-2; disc dehydration and mild interspace narrowing, with large far lateral foraminal disc herniation beyond the lateral foraminal zone and mild far lateral nerve impingement at L2-3; normal findings at L3-4; disc dehydration, mild interspace narrowing, minimal bulging disc, and widely patent central canal and neural foramina at L4-5; and disc dehydration and posterior interspace narrowing, with large right proximal foraminal and right lateral ruptured disc herniation producing severe compression of the traversing subarticular lateral recess nerve on the right, and no significant neural compression on the left at L5-S1.   (Tr. 865).

On April 16, 2018, Dr. Smith performed a fusion of Robinson's L5-S1 vertebrae. (Tr. 890-91).   A post-procedure CT scan of her lumbar spine revealed a solid fusion but "prominent bony overgrowth which effaces the lateral recesses, greater on the right with mild displacement of the proximal right S1 nerve root sheath.   Additionally, the hypertrophic changes extend to the right neural foramen with encroachment on the exiting right L5 nerve root sheath"; "a right-sided disc bulge at L4-5 with mild effacement of the right lateral recess"; and "a right frontal and far lateral disc bulge at L2-L3 with mild to moderate foraminal narrowing."   (Tr. 892-93).

18

On April 24, 2018, Dr. Smith stated Robinson was "doing very well in regard to the right lower extremity pain," and her right-sided symptoms had mostly disappeared. (Tr. 889).   She continued to experience some low back pain, but Dr. Smith opined that was "expected at this point."   (*Id.*).   The examination revealed significant pain with range of motion in the left hip, and radiation into the groin, buttock, and leg.   X-rays displayed severe bilateral hip osteoarthrosis.   Dr. Smith recommended a left hip injection, advised Robinson to continue to use a walker, and instructed her to remain off work.   (*Id.*).

On May 4, 2018, Robinson continued to experience some left lower extremity radicular symptoms which pain medication did not improve.   She used a back brace, and she exhibited slow gait and station.   Dr. Smith opined Robinson may experience some chemical radiculitis of the left lower extremity, recommended an L5-S1 transforaminal block, and instructed her to remain off work.   (Tr. 888).

On May 11, 2018, Robinson received a transforaminal epidural steroid injection on the left at L5-S1.   (Tr. 876).

On May 15, 2018, Robinson continued to complain to Dr. Smith of significant pain in her low back and left lower extremity, and the transforaminal block did not help her pain.   The CT scan of Robinson's lower spine revealed the left lateral foramen had opened up significantly.   Dr. Smith advised Robinson's recovery might take more time, and he instructed Robinson to remain off work.   (Tr. 887).

On May 22, 2018, Robinson reported some of her neck pain and left upper extremity paresthesias had returned.   She complained of significant low back pain that commenced after her epidural injection.   She also experienced pain going down her left leg.   Dr. Smith recommended an MRI and instructed Robinson to remain off work. (Tr. 886).

On February 5, 2019, Robinson complained to Dr. Smith of continued neck pain, occasional pain down the left upper extremity, and right lower extremity pain. She reported physical therapy and a TENS unit helped her symptoms, but they did not completely rid her of pain.   Dr. Smith opined she had reached maximum medical improvement and referred her for a Functional Capacity Evaluation (FCE).   (Tr. 987).

On February 20, 2019, Robinson reported continued neck and shoulder pain during a visit to Lakeshore Family Practice, but the physical examination revealed normal range of motion with no pain in Robinson's neck.   (Tr. 1001).

On February 27, 2019, Robinson saw Dr. Charles T. Carnel at OrthoAlabama Spine & Sports, with complaints of level 4-5 neck pain radiating into her right and left arms.   She also reported numbness, swelling, tingling, weakness, headaches, and sleep disturbance.   Rest relieved her symptoms, and activity increased them.   She exhibited normal cervical spine alignment, and she demonstrated midline and paraspinal tenderness, but no step-off or paraspinal spasm existed.   She displayed limited cervical range of motion, with pain on extremes of motion.   She had full strength in the upper

extremities, equal reflexes, and negative Spurling's sign, but she displayed decreased sensation in three fingers of her left hand.   Dr. Carnel assessed cervicalgia, cervical radiculopathy, and spondylosis without myelopathy or radiculopathy.   He prescribed Cymbalta.   (Tr. 1053-55).

On March 2, 2019, Robinson underwent an FCE.   She exerted good effort during the examination, and she demonstrated the ability to meet the demands of the light strength category.   Specifically, she could lift and carry up to 20 pounds.   She experienced a mild balance issue when walking to the restroom, and she needed to balance herself when walking out the door.   Thus, the examiner recommended limiting her ambulation to flat terrain, restricting work from unguarded heights, and avoiding ladders and slick hilly terrain.   She reported level 3 pain at the beginning of the examination and level 5 pain at the end.   The examiner also recommended Robinson sit and stand as needed.   (Tr. 1007).   Dr. Smith reviewed the FCE on April 2, 2019. He agreed with the finding that Robinson could perform work in the light category. (Tr. 1047).

On March 20, 2019, Robinson visited Lakeshore Family Practice for a follow up regarding her blood pressure.   She reported feeling achy pain when she travels, and that the recent FCE increased her pain.   The physical examination revealed normal range of motion with no pain in Robinson's neck.   (Tr. 1017).

On April 24, 2019, Robinson presented to Dr. Carnel with level 3 neck pain. The clinical examination mirrored Dr. Carnel's February 27 findings. Dr. Carnel noted Robinson had received partial relief from Cymbalta. (Tr. 1056-58).

On June 12, 2019, Dr. Stephen Henderson at Lakeshore Family Practice completed a Questionnaire. He indicated Robinson's shoulder and cervical pain with limited activities of the upper extremities could reasonably arise from her medical history. He did not expect her cervical and lumbar spine issues to cause an increase in migraine headaches. He opined Robinson would experience mild impairment if she engaged in sustained work activities. (Tr. 1044-45).

On June 19, 2019, Robinson presented to Dr. Carnel with level 4 neck pain. The clinical findings did not vary significantly from previous visits. (Tr. 1059-61).

On June 26, 2019, Dr. Henderson submitted a letter stating:

> The above patient has mostly been going to worker's compensation physicians for several years and has only been seen twice here in the last two years. She came into my clinic today with all her records underlined with what she called errors (such records that she had obtained in the process of obtaining social security disability). She stated that she is on 30% disability for the worker's compensation injury now. She had multiple complaints of falling, migraines, weakness, neck and back pain, dizziness and anxiety and depression, and hypertension. She brought in a function assessment which she says shows she could not work as a nurse. The report mentions a restriction of 20 lbs lifting by her worker's comp physician Dr. Smith. However, she walked into the office without an assistive device. She has no bruises or scratches from falls. She had no muscle atrophy in her neck or arms or legs. She held and turned her head just fine when monitoring her BP, but when the neck was assessed in the exam today she grimaced but had not done that prior to exam. She has

22

been prescribed generic Topamax for migraines but states she has not taken it due to cost.   She walks the dog ½ mile which she does several times each week.   She is capable of being a mother for a 15 year old and 11 year old who help with housework.   I really cannot justify any reason for full social security at the present time.   She certainly has had medical problems such as cervical disc disease, hypertension, occasional migraines, obesity and anxiety and depression and chronic pain.   With her degree as a nurse I would think that she could work in an office doing PA's for medications or some other light weight work, that with her education and training she should be able to perform.   I suspect that if any disability would be awarded it could be on the basis of anxiety and depression and I have no records that address that from her psychiatric therapists.

(Tr. 1041).

On July 12, 2019, Robinson received an epidural steroid injection at C7 on the left.   (Tr. 1062).

On July 24, 2019, Robinson presented to Dr. Carnel with level 3.5 neck pain. The clinical findings did not vary significantly from previous visits.   Dr. Carnel recommended another epidural steroid injection, and Robinson received the injection on August 2, 2019.   (Tr. 1064-67).

On August 5, 2019, Robinson presented to the Emergency Department at Marshall Medical Center – South, complaining of moderate level neck pain, abrupt in onset, but with no radiation.   Rotating the head worsened the pain.   The physical examination revealed pain in the neck upon movement; moderate soft tissue tenderness in the right mid and lower neck, left mid and lower neck, and mid and lower central neck; and no erythema or signs of infection.   The examination of her back produced

normal results, with painless range of motion.  She also exhibited normal range of motion in her extremities, and she rendered a normal neurological examination.   A CT scan revealed large central posterior osteophytes of C5 and C6 that produce central canal stenosis; no obvious acute epidural abnormality; normal parotid, submandibular, sublingual, and thyroid glands; no adenopathy; normal vascular structures; and normal airway.  The Emergency Department Nurse Practitioner prescribed pain medication, muscle relaxers, and nausea medication.  (Tr. 1079-83).

On August 7, 2019, Robinson reported to Dr. Carnel that her pain increased sufficiently after the August 2 injection to warrant an emergency room visit.  The clinical findings did not vary significantly from previous visits.  Robinson desired another nerve block.  (Tr. 1069-71).

On August 9, 2019, Dr. Carnel ordered a cervical MRI, which exhibited mild foraminal narrowing bilaterally at C3-4, mild to moderate foraminal narrowing bilaterally at C4-5, residual posterior osteophyte at C5-6 with slight cord flattening in the midline, otherwise widely patent central canal and foramen at C5-6, and no significant stenosis at C7-T1.  (Tr. 1076).  On August 12, 2019, Robinson reported level 5 pain.  Dr. Carnel increased Robinson's dosage of Cymbalta and directed her to follow up in eight weeks.  (Tr. 1072-74).

These records reflect that though Robinson continued to experience pain and numbness after her cervical and lumbar spinal surgeries, the surgeries improved her

conditions.   She sometimes complained of severe pain, but most often her pain level did not exceed five out of ten, indicating moderate symptoms at most.   She retained good motor strength in all extremities, and she suffered no more than mildly limited range of motion.   Dr. Smith released her to return to limited work after her cervical spine surgery, and imaging reports indicated the procedure improved the spinal compression, with no more than mild to moderate narrowing of the spinal canal.   After her lumber spinal surgery, scans exhibited only mild or mild to moderate continued spinal compression and significant opening of the spinal canal.

Dr. Smith agreed with the March 2, 2019, FCE stating Robinson could perform light work, and the ALJ found Dr. Smith's conclusion partially persuasive as the ALJ also concluded Robinson could perform light work.   (Tr. 25).   Dr. Henderson opined Robinson would experience only mild impairment if she engaged in sustained work, and he opined Robinson could perform light weight work.

Doctors' opinions about a claimant's ability to work are not dispositive, as the Commissioner retains authority over all vocational determinations.   *See Walker v. Soc. Sec. Admin., Comm'r*, 987 F.3d 1333, 1338-39 (11th Cir. 2021) (citing 20 C.F.R. § 404.1527(d)).   Moreover, the light duty and sedentary duty restrictions Dr. Smith imposed arise under the worker's compensation system, and they do not necessarily correlate to the ability to perform light and sedentary work under the Social Security

Act.   Even so, these opinions do constitute some evidence to support the ALJ's RFC finding.

In addition to evidence from Robinson's medical providers, Dr. Victoria Hogan, the state agency physician, reviewed Robinson's records on March 9, 2018.   Dr. Hogan opined Robinson could occasionally lift and carry up to 20 pounds and frequently lift and carry up to ten pounds.   She could stand and/or walk for a total of six hours, and sit for a total of six hours, during an eight-hour workday.   She could perform unlimited pushing and pulling movements within her weight limits.   She could frequently climb ramps and stairs, balance, and stoop; occasionally kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds.   She could perform unlimited handling, fingering, and feeling, but she could only perform limited overhead reaching.   She possessed no visual or communicative limitations.   She could tolerate unlimited cold, wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation, but she should avoid all hazards such as machinery and heights, as well as concentrated exposure to extreme heat.  (Tr. 335-47).   The ALJ found the state agency opinion persuasive, and he mostly mirrored that opinion for his residual functional capacity finding, except he added a restriction to occasional overhead reaching.   (Tr. 20, 26).

Taken together, the record medical evidence provides substantial evidentiary support to the ALJ's residual functional capacity finding.   Though Robinson's spinal impairments and resulting pain may prevent her from performing her past work as a

26

nurse, substantial evidence supports the ALJ's conclusion that she could perform other light work, including her past work as a store manager and retail area manager. The ALJ did not error in considering Robinson's past work, or in assessing her residual functional capacity.

## II.   The Appeals Council Properly Considered the New Evidence Robinson Submitted

Generally, a claimant may present new evidence at each stage of the administrative process. *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1261 (11th Cir. 2007) (citing 20 C.F.R. §404.900(b)). The Appeals Council will review a case if it receives additional "evidence that is new, material, and relates to the period on or before the date of the [ALJ] hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. § 404.970(a)(5).

Robinson submitted the following new evidence to the Appeals Council after the ALJ's decision:   (1) records from St. Vincent's Orthopedic dated November 12, 2019 to February 4, 2020; (2) records from Outpatient Care Center dated December 6, 2019, to December 16, 2019, and March 9, 2020, to June 5, 2020; (3) records from Image South dated January 27, 2020, to February 18, 2020; (4) records from Marshall Medical Center South dated January 31, 2020; (5) records from Andrew's Sports Medicine dated March 9, 2020, to April 29, 2020; and (6) records from St. Vincent's Birmingham dated

27

August 4, 2020, to August 11, 2020.[2]

Those records portray that on August 9, 2019, a cervical spine MRI exhibited mild foraminal narrowing at C3-4; mild to moderate foraminal narrowing bilaterally at C4-5; previous anterior interbody fusion, residual posterior osteophyte with slight cord flattening at the midline, but otherwise widely patent central canal at C5-7; and no significant stenosis at C7-T1.   (Tr. 213).

On November 19, 2019, Dr. Smith ordered a cervical CT myelogram because of Robinson's continued pain complaints.   The scan revealed some degenerative change at C1-2; no significant stenosis at C2-3; some right uncinate spurring producing mild to moderate right foraminal narrowing at C3-4; slight decreased filling of the right C4 nerve root sleeve; patent C3-4 foramen; no significant stenosis at C4-5; previous solid anterior interbody fusion at C5-7; midline posterior osteophytes at C5-6, causing mild narrowing of the central canal and some anterior cord effacement; patent foramen at C5-6; slight residual osteophytic protrusion without cord compression at C6-7, and with patent foramen; and moderate to moderately severe foraminal stenosis bilaterally at C7-T1.   (Tr. 211, 268, 291).   Dr. Smith noted the C7-T1 impairment had "progressed since prior studies," and he recommended Robinson receive nerve blocks.   (Tr. 210).

---

[2] The Appeals Council also received August 5, 2019, records from Marshall Medical Center South, and October 18, 2019, records from Outpatient Care Center.   It did not exhibit that evidence because it did not show a reasonable probability of changing the outcome of the administrative decision.   (Tr. 2). Robinson does not contest that conclusion.

On January 7, 2020, an epidural block had completely resolved the symptoms in Robinson's arms, but she still felt some soreness in the neck that she could tolerate. Dr. Smith instructed Robinson to continue work under the restrictions of her FCE. (Tr. 208).

On January 21, 2020, Robinson reported to Dr. Smith that her neck pain returned after receiving blocks at C7-T1, and she also experienced back pain radiating to her left lower extremity that caused her to drag her foot.   Dr. Smith restricted her to sedentary work.   (Tr. 207, 253).

On January 27, 2020, Robinson underwent a CT myelogram of the lumbosacral spine.   The scan revealed mild degenerative changes at T12-L1 and L1-2; partial osteophyte right-sided disc protrusion at L2-3, causing mildly narrowed foramen without nerve root impingement and no impingement of the L2-3 left foramen; annular bulge but no significant stenosis at L3-4; mild broad central disc protrusion slightly more prominent on the right at L4-5, with no definite nerve root impingement and patent foramen; and previous anterior interbody fusion at L5-S1, with less prominent intrusion compared to previous MRI; slight effacement of the right S1 nerve root take-off, but no left S1 nerve root effacement; and widely patent foramen at left L5-S1.   (Tr. 209, 273).

On January 31, 2020, Robinson presented to the Emergency Department at Marshall Medical Center – South, with complaints of moderate lower extremity pain.

An x-ray produced normal findings.   The attending physician assessed sciatica and prescribed medication.   (Tr. 167-81).

On February 2, 2020, Dr. Smith opined Robinson's symptoms at C7-T1 resulted from increased stress due to her previous cervical fusion. Based upon the January 27, 2020, scan, Dr. Smith assessed left lower extremity radiculitis, but Robinson nonetheless displayed full muscle strength in the left lower extremity.   Dr. Smith recommended a lumbar epidural steroid injection and continued C7-T1 blocks, and he advised Robinson could return to work at the sedentary level.   (Tr. 204-05, 252).

On October 18, 2019, December 6, 2019, March 9, 2020, and June 5, 2020, Dr. Carnel administered cervical epidural steroid injections, and on May 22, 2020, he administered a lumber injection.   (Tr. 79, 92-166, 182-201, 232-50).   On April 29, 2020, Dr. Carnel stated Robinson's "[s]ymptoms are similar as before."   Robinson demonstrated "relatively full" cervical range of motion, good upper extremity muscle strength, and normal gait.   (Tr. 70).

On August 3, 2020, Dr. Smith performed another cervical fusion at C7-T1, for "adjacent level disease" in Robinson's cervical spine.   (Tr. 82-88).   The new records do not contain any reports of Robinson's condition after that procedure.

The Appeals Council applied the following standard when assessing the new evidence:

>        We receive additional evidence that you show is new, material, and relates to the period on or before the date of the hearing decision.   You must also show there is a reasonable probability that the additional evidence would change the outcome of the decision.   You must show good cause for why you missed informing us about or submitting it earlier.

(Tr. 1-2).   The Appeals Council concluded the new evidence did not relate to the period at issue, as the ALJ decided Robinson's case through October 23, 2019. Therefore, the new evidence did not "affect the decision about whether [Robinson was] disabled beginning on or before October 23, 2019."   (Tr. 2).   The Appeals Council advised Robinson she could file a new application if she desired consideration whether she suffered a disability after October 23, 2019, and she could file a civil action if she disagreed with the ALJ's decision.   (*Id.*).

Robinson first argues the Appeals Council applied the incorrect legal standard when it assessed whether a reasonable *probability* existed that the new evidence would change the outcome of the administrative decision, as it should have assessed whether a reasonable *possibility* existed of changing the outcome.   (Doc. 15, at 21).   That argument lacks merit.   Effective January 17, 2017, the Commissioner revised 20 C.F.R. § 404.970(a)(5) to include the above-stated requirement that new evidence must demonstrate a "reasonable probability" of changing the outcome of the ALJ's decision, with compliance required as of May 1, 2017.   *See* 81 FR 90987-01, 2016 WL 7242991 (Dec. 16, 2016).   Thus, the Appeals Council correctly applied the language of the regulation in effect on the date of Robinson's appeal.

31

Robinson next argues the Appeals Council erroneously concluded the new evidence did not relate to the time period in question.   As the Eleventh Circuit recently reiterated, "'[m]edical opinions based on treatment occurring after the date of the ALJ's decision may be chronologically relevant.'"  *Howze v. Soc. Sec. Admin.*, No. 21-11066, 2022 WL 152236, at *2 (11th Cir. Jan. 18, 2022) (quoting *Washington v. Social Security Administration, Commissioner*, 806 F.3d 1317, 1322 (11th Cir. 2015)) (alteration in original).  The Eleventh Circuit explained its method for evaluating the chronological relevance of such opinions:

> In *Washington*, the claimant submitted to the Appeals Council a psychologist's evaluation and accompanying opinion about the degree of the claimant's mental limitations, which were prepared seven months after the ALJ's decision. *Id.* at 1319.  We concluded that the psychologist's materials were chronologically relevant because: (1) the claimant described his mental symptoms during the relevant period to the psychologist, (2) the psychologist had reviewed the claimant's mental health treatment records from that period, and (3) there was no evidence of the claimant's mental decline since the ALJ's decision. *Id.* at 1322-23 (limiting its holding to "the specific circumstances of this case").

> But we have also held that the Appeals Council correctly declined to consider new medical records because the records were "about a later time" than the ALJ's decision, and, therefore, did not affect the decision about whether the claimant was disabled during the relevant period. *Hargress*[ *v. Soc. Sec. Admin., Comm'r*], 883 F.3d [1302,] 1309[ (11th Cir. 2018)]. In *Hargress*, we held that the new records were not chronologically relevant because nothing in them indicated that the doctor, who did not treat the claimant during the relevant period, had reviewed the appellant's medical records, or that the information in the new records related to the period at issue. *Id.* at 1309-10.

*Howze,* 2022 WL 152236, at *2.[3]

Robinson asserts the new records she submitted to the Appeals Council represent a continuation of the treatment she received prior to the ALJ's decision. Indeed, the new records portray Robinson's lumbar spine symptoms continued after the ALJ's decision, as she continued to experience some pain, but scans showed no more than mild to moderate effacement, and she displayed good lower extremity strength. Moreover, until November 19, 2019, the records show Robinson continued to experience moderate neck pain, as she had before the ALJ's decision, and scans showed no more than mild to moderate narrowing of the cervical spinal canal. Even so, those records do not assist Robinson, as the ALJ found her pre-decision treatment records did not reflect disabling impairments in her lumbar and cervical spine, and, as discussed above, substantial evidence supported that finding. Thus, even if the new records represent a continuation of Robinson's pre-decision condition, and therefore bear chronological relevance, they do not demonstrate a reasonable probability of changing the outcome of the ALJ's decision.

As of November 19, 2019, the records portray Robinson developed new, moderate to moderately severe foraminal stenosis at C7-T1. Dr. Smith explicitly stated

---

[3] On November 15, 2021, Robinson filed a notice of Supplemental Authority alerting the court to the Eleventh Circuit's decision in *Pupo v. Comm'r, Soc. Sec. Admin.*, 17 F.4th 1054 (11th Cir. 2021). (Doc. 18). However, the *Pupo* decision merely reiterates the general principle that the Appeals Council errs when it fails to consider new, material, and chronological evidence. *Id.* at 1063.

those findings represented a progression of Robinson's cervical condition, and the problem eventually warranted additional surgery.   As the new records after November 19, 2019, portrayed a worsened condition, they do not relate to the time period prior to the ALJ's decision.   *See McClain v. Soc. Sec. Admin.*, 760 F. App'x 728, 732-33 (11th Cir. 2019) (psychologist's report did not relate back to the time period of the ALJ's decision when it reflected the claimant's cognitive skills declined in the interim); *Ring v. Soc. Sec. Admin., Comm'r*, 728 F. App'x 966, 969 (11th Cir. 2018) (doctor's evaluation did not relate to the relevant time period when it reflected "the worsening of a condition or the onset of a new condition after the date of the ALJ's decision").

In summary, the Appeals Council did not err in evaluating the new evidence Robinson submitted after the ALJ's decision.

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision. The court will enter a separate final judgment.

**DONE** this 14th day of September, 2022.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE